Filed 10/22/15  P. v. Kelly CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EMILY ALLISON KELLY,<br><br>    Defendant and Appellant. | F068251<br><br>(Super. Ct. No. MF010309A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Harry M. Dougherty, Judge.  (Retired judge of the Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Monique Q. Boldin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Poochigian, Acting P.J., Detjen, J. and Smith, J.

Defendant Emily Allison Kelly was convicted by jury trial of possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); count 1), carrying a concealed dirk or dagger (Pen. Code, § 21310; count 2), misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364.1; count 3), and misdemeanor being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a); count 4). On appeal, she contends a mistake in a written jury instruction requires that her conviction for carrying a concealed dirk or dagger be reversed. We affirm.

## FACTS

On May 8, 2012, at about 1:30 a.m., Kern County Sheriff's Deputies Mountjoy and Chambless were dispatched to a residence in the Mojave area. They exited their patrol vehicle and walked up to the residence. As they approached, they encountered defendant and a heavily intoxicated male, Miles, outside the residence. Defendant, who was standing near the open carport, exhibited symptoms of methamphetamine use.

A few feet from defendant were a pile of rocks, a large soda-type cup with a straw coming out of it, some clothing, shoes, and a lady's purse. The deputies asked defendant if these were her items, and she said everything except the purse was hers. The purse was about five inches from the soda cup and about 12 inches from the other items. The items appeared to be all together. The purse did not have any dust or debris on it. Defendant said something about rocks. When the deputies requested her identification, she said it was inside her vehicle. They asked if they could search her vehicle, but when they did, they found no identification. Then they inquired about the purse, again asking if it was hers. She said it was not. The deputies did not see any other females present.

When the deputies determined they would be arresting defendant for being under the influence of a controlled substance, they searched the purse. Inside, they found defendant's driver's license, mail addressed to her, two methamphetamine pipes, and a baggie containing a usable amount of methamphetamine.

2.

Deputy Mountjoy while speaking to defendant did not observe any weapons over her clothing. When Deputy Morales arrived on the scene, she got a good look at defendant's upper body and, like the other deputies, did not see any weapons. Deputy Morales asked defendant if she had any weapons and she said she did not. But when Deputy Morales searched defendant, she found a small, fixed-blade knife in a leather sheath hanging from a lanyard around defendant's neck and concealed under her shirt and over her bra.

At the station, defendant was extremely uncooperative and she refused to provide a urine sample.

### *Defense Evidence*

Defendant's father, Forest Helm, testified that he owned the Mojave residence with defendant. One of his other daughters lived there. He went to the property often to water the trees and clean up some of the junk around there. When he visited before May 8, 2012, he noticed junk in the carport. There was a purse or bag that had papers and other things in it. The bag had been there for five or six weeks. He let his other daughter know it was there.

On cross-examination, Helm explained that he did not pay too much attention to the bag until one day he thought it might be important to someone. So he opened it and saw quite a few papers inside. But he did not read them and did not see papers belonging to defendant. He agreed that sandstorms were not infrequent in Mojave. The first time he mentioned to defense counsel that he had seen the bag was on the day before this testimony.

On redirect, Helm said the bag was brown and kind of like a purse.

On recross-examination, Helm testified he was not sure if he was at the residence at the time of defendant's arrest.

On redirect, he said he did not think he was present when defendant was arrested.

3.

Defendant's husband, William Kelly, testified that defendant's car had been stolen close to the time of her arrest. Defendant normally always had her purse with her. But after the car was stolen, he no longer saw her purse in the house. He had no idea where her purse was at that time.

Kelly was not present when defendant was arrested. He later went to retrieve her property from the evidence room. He was given a large, brown bag. He did not recognize the bag and wondered whose bag it was.

On recross, Kelly said he did not think defendant's purse had ever been recovered. He received only the brown bag that he did not recognize as hers. Nevertheless, he did not go to anyone in law enforcement and tell them the bag he received was not his wife's purse.

Defendant testified on her own behalf. She explained that when her car was stolen, it was missing for about 10 days before it was found. The small, black purse she had been using, which contained her keys, wallet, and identification, was stolen along with the car.

She was at the residence that evening because her sister had called her and told her there were some items left in her carport that had been stolen in her car. They had been there for some time, but she had forgotten to tell defendant. When defendant arrived at the residence that night, her sister wanted her to come into the house. Defendant declined and said she was there to get her property. The sister got upset and called the police. The deputies arrived when defendant was outside with Miles. She told them there was no disturbance. She was wearing shorts and sandals, and she was getting cold. She had stopped by her girlfriend's house and had borrowed her girlfriend's daughter's black velveteen jacket that had a broken zipper and did not close. Under that jacket, she was wearing a very light camisole-type of blouse. She wore a small knife hanging around her neck and hanging over her camisole. The knife was a gift purchased at a sporting goods store.

4.

Deputy Morales asked her if she had anything illegal and she said no.  As Deputy Morales moved behind her and started searching her, Deputy Morales asked her if she had any weapons.  Defendant said yes, but Deputy Morales found the knife at the same time.  The knife was hanging over the camisole but under the jacket that would not zip up.

Defendant told the deputies her identification was in the middle console of her car. They did not find it because they did not look where she told them to look.  When the deputies asked her if the purse was hers, she said it was not.  She did not know how her identification got into the bag, which belonged to Miles.  The papers got into the bag with her permission.  The methamphetamine and pipes were not hers.  She had never seen them before and was not aware they were in Miles's bag.

She wanted to give the deputies a urine sample, but she did not receive the water she asked for and then she fell asleep.  She was never given the opportunity to give a sample.

On cross-examination, defendant explained that the lady's purse belonged to Miles, and he put defendant's mail, court documents, and lipstick into his purse.  She told the deputies that the person who stole her car (her nephew) must have stolen her things and put them in the purse.  Her nephew stole the car at gunpoint, causing her, Miles, and another man to jump out of her moving car.

Regarding the knife, defendant explained that all three of the deputies were talking to her at the same time.  When Deputy Morales decided to search her, Deputy Morales walked behind her and told her to raise her hands.  Deputy Morales asked her if she had anything illegal on her and she answered that she did not.  Defendant's knife was hanging where everyone could see it, but her black jacket probably caused the deputies to miss it. When Deputy Morales found the knife, she laughed and laughed at the other deputies and showed them how funny it was that they had missed it.  Yet Deputy Morales did not think it was very funny; she pointed it out and the other deputies laughed.  She said, "[L]ook

5.

what you guys missed." Defendant agreed with the prosecutor that the knife had been "right in the open the whole time just everyone didn't see it."

Defendant explained that she did not refuse to provide a urine sample. She was looking forward to providing one because a deputy told her she would not be charged if she gave a sample that proved she was not on drugs.

Defendant and her husband later went to retrieve her personal items from the sheriff's station. She took Miles's purse, even though it was not hers, because he was incarcerated and asked her to get it.

Following this testimony and the attorneys' arguments, the trial court orally instructed the jury. Regarding count 2, the trial court orally instructed the jury with CALCRIM No. 2501, as follows:

> "The defendant is charged in Count 2 with unlawfully carrying a concealed dirk or dagger, in violation of Penal Code Section 21310. To prove the defendant is guilty of this crime, the People must prove:
>
> "One, the defendant carried on her person a dirk or dagger.
>
> "Two, the defendant knew that she was carrying it.
>
> "Three, it was substantially concealed on the defendant's person; and
>
> "Four, the defendant knew that it could be readily used as a stabbing weapon.
>
> "The People do not have to prove the defendant used or intended to use the alleged dirk or dagger as a weapon. A dirk or dagger is a knife or instrument with or without a hand guard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. Great bodily injury means significant or substantial physical injury. It is an injury that is greater than moderate or minor harm.
>
> "A pocket knife or non-locking folding knife is not a dirk or dagger unless the blade is exposed and it is in a locked position. *A knife carried in a sheath worn openly is not concealed*." (Italics added.)

The written form of this instruction, however, contained an additional phrase in the final sentence. It stated:

"The defendant is charged in Count 2 with unlawfully carrying a concealed dirk or dagger in violation of Penal Code section 21310.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant carried on her person a dirk or dagger;

"2. The defendant knew that she was carrying it;

"3. It was substantially concealed on the defendant's person;

"AND

"4. The defendant knew that it could readily be used as a stabbing weapon.

"The People do not have to prove that the defendant used or intended to use the alleged dirk or dagger as a weapon.

"A dirk or dagger is a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"A pocket knife or nonlocking folding knife is not a dirk or dagger unless the blade is exposed and in the locked position.

"A knife carried in a sheath and worn openly *suspended from the waist of the wearer* is not concealed." (Italics added.)

## DISCUSSION

Defendant contends the mistaken phrase ("suspended from the waist of the wearer") in the written instruction was factually unsupported by the evidence and likely misled the jury into believing that the only place in which a person could legally wear an unconcealed sheathed knife is around the waist and not around the neck or some other

7.

part of the body. She asserts that this instruction vitiated her defense that she wore the sheathed knife openly around her neck.

The People concede the written instruction was technically erroneous because there was no evidence defendant wore the knife around her waist. But they argue there is no reasonable probability the erroneous instruction could have led the jury to conclude that a sheathed knife worn openly around the *waist* is *not* concealed but a sheathed knife worn openly around the *neck is* concealed.

The additional phrase, "suspended from the waist of the wearer," is found in the official CALCRIM No. 2501 instruction itself, as part an optional sentence: "[A knife carried in a sheath and worn openly suspended from the waist of the wearer is not *concealed*.]" Presumably, this optional sentence is provided because sheathed knives are often worn on a belt around the waist. But in this case, it was not. Accordingly, the trial court correctly eliminated the "suspended from the waist of the wearer" phrase from the oral instruction, tailoring the instruction to the facts of the case. Unfortunately, the phrase was mistakenly left in the written instruction.

When oral and written instructions conflict it is presumed the jury followed the written instructions. (*People v. Mills* (2010) 48 Cal.4th 158, 201; *People v. Majors* (1998) 18 Cal.4th 385, 409-410.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803-804.) We assess instructions "in the context of the evidence presented and other circumstances of the trial to determine whether the error was prejudicial." (*People v. Flood* (1998) 18 Cal.4th 470, 489.)

Here, we conclude the instructional error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "First, the court orally instructed the

jury with the correct instruction. Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule. It is thus possible the jury followed the oral instruction. Second, there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point." (*People v. Wilson*, *supra,* 44 Cal.4th at p. 804.) Third, the evidence was overwhelming that the knife hanging around defendant's neck was substantially concealed and not worn openly. The deputies did not see the knife and were unaware of its presence until Deputy Morales found it under defendant's shirt during a search of her person. Even if the jury believed defendant's version, she testified that the deputies did not see the knife because the jacket she was wearing covered it. Thus, defendant's testimony supported the conclusion that the knife was substantially concealed by her jacket.

We agree with the People that it is extremely unlikely the jury would have taken the erroneous instruction to mean that the only way an openly worn sheathed knife could be considered not concealed is if it is suspended from the *waist*, as opposed to the *neck*. The entire issue regarding the knife was whether it was *concealed*, not whether it was suspended from defendant's waist or neck. "We 'credit jurors with intelligence and common sense'" (*People v. McKinnon* (2011) 52 Cal.4th 610, 670), and we think there is no reasonable possibility the jury applied the challenged instruction in the manner defendant proposes, particularly in light of the testimony and argument presented in this case. Considering all of the factors, we conclude the error did not contribute to the guilty verdict and was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.